# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### ABILENE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Case No.: 1:14-cv-185-C |
| | § |
| PAUL R. DOWNEY, JEFFRY P. DOWNEY, | § |
| and JOHN M. LEONARD, | § |
| | § |
| Defendants. | § |
| | § |

## PLAINTIFF'S MOTION FOR FINAL JUDGMENT BY DEFAULT AGAINST DEFENDANT PAUL DOWNEY, AND BRIEF IN SUPPORT

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission ("Commission") respectfully moves the Court to enter final judgment by default against Defendant Paul Downey ("Defendant," or " Paul Downey"). The Commission requests that the final judgment include the relief requested in the Complaint, including:

(1)　a permanent injunction against Paul Downey from violating Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(2)　a permanent injunction against Paul Downey from, directly or indirectly, soliciting existing or potential investors to purchase or sell securities, provided however that such injunction shall not prevent him from purchasing or selling securities for his own account;

(3)　a permanent injunction against Paul Downey from participating, directly or indirectly, in any securities offering, including acting as a manager, administrator, promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance of any securities;

(4)　disgorgement of $4.8 million, representing ill-gotten gains obtained as a result of Paul Downey's conduct, plus prejudgment interest of $879,935;

(5)     a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and
        Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be
        determined by the Court;

(6)     an order  barring him, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §
        77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from
        serving as an officer or director of any issuer that has a class of securities
        registered under Section 12 of the Exchange Act or that is required to file reports
        under Section 15(d) of the Exchange Act; and

(7)     such additional relief as the Court deems just, appropriate, and equitable.

In support of this motion, the Commission respectfully shows as follows:

## I.
## STATEMENT OF FACTS

**A.     Procedural History**

1.      On November 20, 2014, the Commission filed its Complaint.  [Doc. 1].   In the
investigation preceding the filing of this action, Paul Downey invoked his Fifth Amendment right
not to incriminate himself and did not testify.  *See* **Exhibit 1**, Declaration of B. David Fraser
("Fraser Dec."), ¶ 4.

2.      On November 22, 2014, the Commission served a *Summons* and its *Complaint* on
Paul Downey.  [Doc. 9].  The *Executed Service of the Summons and Complaint* upon Paul Downey
was filed with the Court on January 13, 2015.  *Id.*; **Exhibit 1,** ¶ 5.  Separately, as explained in the
Commission's March 17, 2015 Motion for Leave to Use Alternative Means of Service of Process as
to Defendant John M. Leonard and Brief in Support [Doc. 11], Defendant John Leonard apparently
took steps to evade service, forcing the Commission to ask for alternative service.  [*Id.*]  The Court

granted that Commission's motion the following date (March 18, 2015), concluding that Leonard had been served as of March 18, 2015.[1]

3.      On January 23, 2015, a January 21, 2015 letter styled "Response of Paul and Jeff Downey to Civil Action No. 1:14-cv-185" was entered on the Court's docket (the "January 21, 2015 letter"). [Doc. 10].  The letter was signed by Defendant Jeff Downey.  *Id.*

4.      After the Downeys were served in November 2014 but before the January 21, 2015 Letter, counsel for the Commission and Paul Downey exchanged several e-mails and other communications related to the Defendants' deadlines to respond to the Commission's Complaint. **Exhibit 1**, ¶ 6.  Counsel for the Commission and Paul Downey also engaged in very preliminary, and ultimately unsuccessful, settlement discussions.  *Id.*  At Paul Downey's request, counsel for the Commission agreed to allow Defendants to have until January 22, 2015 to answer or otherwise respond to the Complaint.  *Id.*   However, Paul Downey never filed any of his requests – or agreements by counsel for the Commission –to extend this deadline with the Court.  Further, Paul Downey e-mailed the January 21 letter to Commission's counsel on January 21, 2015. **Exhibit 1**, ¶ 7.[2]

5.      On March 24, 2015, the Court issued an Order construing the January 21, 2015 letter as the Answer of Defendant Jeffry Downey to the Plaintiff's Complaint, because it was signed only by him and because he cannot appear on behalf of Paul Downey.  [Doc. 13].  The Commission e-mailed that Order to both Paul and Jeff Downey that same day.  **Exhibit 1**, ¶ 9.

---

[1]      As a result, Leonard was required to answer or otherwise respond to the Commission's Complaint by April 8, 2015.  The Commission intends to file: (i) for entry of default and default judgment, as soon as practicable.

[2]      In their putative motion to dismiss, Defendants Paul and Jeffry Downey suggest that Plaintiff's counsel engaged in "bogus settlement discussions to take advantage of the rules."  This *ad hominem* attack is unfounded and merely confirms that Defendants have no meritorious defense.  Plaintiff's counsel engaged in settlement discussions in good faith and responded appropriately to the Court's orders.

6.      In a separate  March 24, 2015 Order, the Court stated that the Commission's claims against Paul Downey will be dismissed without prejudice if the Commission does not move for entry of default and for default judgment by or before 9:00 a.m. on April 14, 2015.  [Doc. 14].  The Commission e-mailed that Order to both Paul and Jeff Downey that same day.  **Exhibit 1**, ¶ 10.

7.      On March 25, 2015, the Commission filed its request for the Clerk to enter default against Paul Downey.  [Doc. 16].

8.      On March 27, 2015, the Clerk entered default against Paul Downey.  [Doc. 17].  As reflected in that entry of default against him, Paul Downey has not filed an answer to the complaint.  [*Id.*]  The Commission e-mailed that the Entry of Default to the Downeys.  **Exhibit 1**, ¶ 12.

9.      To date, Paul Downey has not filed a motion to set aside the clerk's entry of default.  Instead, on March 27, 2015, the Downeys filed "Defendants Motion to Dismiss, Award Legal Fees, Damages and Return of Assets," which purports to be signed by both Downeys.  [Doc. 18].

**B.      Paul Downey Remains in Default.**

The Commission, as noted above, recognizes that Paul Downey recently filed a putative motion to dismiss.  However, he has failed to first move the Court to set aside the entry of default; therefore, the motion to dismiss does not cure his default.  Even if  he had filed such a motion, it would fail.   Rule 55(c) of the Federal Rules provides that "the court may set aside an entry of default for good cause . . ." FED. R. CIV. P. 55(c).  It is the defaulting party's burden to show that default should be set aside.  *See TCI Group v. Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001) (citations omitted). Three factors govern the lifting of entries of default under Rule 55(c): (i) "whether the defendant has a meritorious defense;" (i) "whether the defendant's culpable conduct led to the default;" and (iii) "whether reopening the default judgment would prejudice the plaintiff." *Id.* "Judgment by default is a drastic step appropriate only in extreme circumstances; a

case should, whenever possible, be decided on the merits." *Signed Personal Check No. 730 of Yurbran S.Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010). However, if any one of the three factors is true, the court may refuse to set aside the default. *Id.*

Here, Defendant has not presented *any* facts showing he may have a meritorious defense. "To justify vacating the default judgment [the defendant] had to present the district court with specific facts that would constitute a defense." *Franchise Holding II, LLC v. Huntington Restaurants Group, Inc.*, 375 F.3d 922, 926 (9th Cir. 2004) (citing *Madsen v. Bumb*, 419 F.2d 4, 6 (9th Cir. 1969)). "A 'mere general denial without facts to support it' is not enough to justify vacating a default or default judgment." *Id.* While not an extraordinarily heavy burden in that the defaulting party need only "allege sufficient facts that, if true, would constitute a defense," it is still a requirement. *Signed Personal Check No. 730*, 615 F.3d at 1094.

This factor is important in determining whether to set aside a default because otherwise "nothing but pointless delay can result from reopening the judgment." *TCI Group*, 244 F.3d 691 at 697 (citing *Hawaii Carpenters' Trust Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986) ("To permit reopening of the case in the absence of some showing of a meritorious defense would cause needless delay and expense to the parties and the court system.")). *See Betram Music Co. v. SC.GS & Co., LLC*, 2009 WL 2259731 *3 (D. Ariz. July 29, 2009) (noting that absent some basic showing of a meritorious defense, there will be greater expense to both the plaintiff and judicial resources for "the same eventual outcome"). That is particularly true here, where Paul Downey, rather than provide the Commission testimony about his actions, chose to assert his Fifth Amendment privilege against self-incrimination. **Exhibit 1**, ¶ 4. Moreover, the Downeys' putative "motion to dismiss" confirms the absence of a meritorious defense. Instead of offering facts showing why the Commission's claims in this case are unfounded, the Defendants raise

unfounded allegations of unspecified complaints about a receivership in a separate action.  [Doc. 18].  It is clear that Paul Downey, who invoked his privilege against self-incrimination in the underlying investigation, will not be able to set out facts necessary to establish a meritorious defense and this factor alone warrants denying a motion to set aside the default and supports entry of a default judgment. *Hawaii Carpenters' Trust Funds,* 794 F.2d at 513; *U.S. v. Weldon*, 2010 WL 1797529 (E.D. Cal. 2010) (holding that failure to present a meritorious defense was "sufficient ground to deny Defendants' motion to set aside the default judgment against them").  Under the circumstances presented here, the Court may determine that Downey has not cured his default.

## C.     The Complaint's Now-Admitted  Factual Allegations

Upon entry of default, a defendant admits the complaint's well-pleaded facts.  *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1973).  Here, the Complaint plainly sets forth allegations showing that Paul Downey committed securities fraud.  As set out in the Complaint and in evidence submitted herewith, the uncontested factual allegations show:

### 1.     The Downeys fraudulently raised $4.8 million from 17 investors.

From January 2010 to May 2011, the father-son duo of Paul and Jeffry Downey used their company, Quest Energy Management Group, Inc. ("Quest"), to raise at least $4.8 million from 17 investors through fraudulent offers and sales of interests in a limited partnership ("LP") called Permian Advanced Oil Recovery Investment Fund I, L.P. ("PAOR"), as well as fraudulent offers of Quest preferred stock.  *See* Complaint ("Compl.") [Doc. 1], ¶¶ 1, 16; **Exhibit 2**, Declaration of Carol Hahn, ¶ 5.  The Downeys' company, Quest, served as PAOR's operating general partner ("GP") and controlled *all* of PAOR's operations.  Compl., ¶16.

### 2.     The Downeys drafted a PPM to solicit investments in PAOR.

In January 2010, the Downeys – through Quest and Leonard – began soliciting prospective investments in PAOR using a private placement memorandum ("PPM") that the Downeys drafted. Compl., ¶¶ 16-17.  The PPM recited that investors in the PAOR offering would acquire: (i) LP units in PAOR, and (ii) Quest preferred stock.  *Id.*, ¶¶ 17, 20.  However, Quest never authorized or issued shares of preferred stock to PAOR or its investors.  *Id.*, ¶20.

The Downeys appended an exhibit to the PPM labeled Quest's "Business Plan 2009 – 2015 Executive Summary" ("Executive Summary"), in which they: (i) touted their vision for Quest "to become one of the larger independent oil and gas producers in the Permian Basin by Q4-2014," and (ii) recited their desire for Quest to be positioned to "introduce its [initial public offering] with a potential market capitalization of $6.2B [Billion] by 2015."  Compl., ¶ 19.  Based on Quest's finances at the time, this representation by the Downeys was baseless and a pipedream.  *Id.*

### 3.    The Downeys failed to disclose Quest's financial condition to investors.

Quest's PPM, drafted by the Downeys, failed to disclose the financial condition of PAOR's operating GP, Quest.  Compl., ¶¶ 16, 21.  At the time it commenced the PAOR offering in January 2010, Quest possessed significant indebtedness on which it was obligated to pay.  For example:

- As of January 2010, Quest still owed acquisition costs of nearly $1 million to the original leaseowners of two oil-and-gas leases Quest had previously acquired.  Compl., ¶¶ 18, 21.

- Quest undertook a $6.5 million obligation when it previously sold Quest-issued Senior Preferred Notes ("SPNs") to investors.  *Id.*

In spite of these significant financial obligations facing PAOR's GP, the Downeys failed to disclose Quest's existing debt obligations, which made promises of "ownership" misleading. Compl. ¶ 22.  Instead, the Downeys included a prospectively-worded boilerplate provision in the PPM that stated, "[i]f [Quest] incurs additional indebtedness a portion of its cash flow will have to be dedicated to the payment of principal and interest on such indebtedness."  *Id.* (emphasis added).

In fact, the Downeys *knew* that the indebtedness was a certainty and that they had to allocate a substantial portion of Quest's cash flow to pay principal and interest on existing debts.  *Id*.

The Downeys further misled investors by painting a rosy picture of Quest's historical and near-term operations, stating in the PPM that, "Quest is a 4-year-old Texas based oil and gas company with a successful track record of developing properties with proven recoverable reserve. . . . PAOR is a low risk development project in fields that have been fully delineated by prior drilling."  Compl., ¶ 23.  To prevent this assurance about PAOR's GP from being materially misleading to investors, the Downeys should have disclosed Quest's existing debt burden, its marginal solvency, and its overextended debt collateral – all of which made the PAOR investment anything but "low risk."  *Id*.  If Quest failed to satisfy its debt obligations, creditors could have foreclosed on its oil-and-gas leases and prevented PAOR investors from receiving *any* returns.

The Downeys also failed to tell PAOR investors that Quest operated at a loss, and had negative operating revenue, every year from 2009 to 2012.  Compl., ¶ 24.  These omissions became increasingly more misleading as Quest's financial condition worsened and cash flows from oil-and-gas leases became barely sufficient to cover operating expenses, let alone existing debt obligations.  *Id*.  By Spring 2011, the prospect of Quest defaulting on its debt obligations was inescapable and obvious to the Downeys.  Compl., ¶ 25.  Bank A repeatedly warned the Downeys that the balance in Quest's operating account had fallen below $10,000, meaning Quest's payroll checks would have bounced if Bank A automatically withdrew Quest's March 2011 loan installment payment (as it was entitled to do).  *Id*.  Despite this known and imminent peril, the Downeys continued the PAOR offering through May 2011 without revising, editing, or otherwise updating the PPM to disclose to investors the bleak financial condition of PAOR's GP and the risks flowing therefrom.  *Id*.

**4.    The Downeys misrepresented current and projected oil and gas production.**

In the PPM, the Downeys represented that 41 of the wells Quest acquired in 2006 and 2007 produced 120 barrels of oil equivalent ("barrels") daily.  Compl., ¶ 27. The Downeys *knew*, however, that these wells produced no more than 78 barrels daily, not 120 barrels.  *Id.*  The Downeys reiterated this misrepresentation in the PPM's "management" section, crediting Jeff Downey with increasing production from 48 barrels monthly in 2005 to 3,800 barrels monthly by December 2009.  *Id.*  Based on *actual* production of 78 barrels daily, monthly production was, at most, 2,400 barrels – not 3,800 barrels.  *Id.*

In the Executive Summary, the Downeys claimed Quest was "currently upgrading acquired properties to increase daily production to 500-1,000 [barrels] by Q3-2010 and has expansion plans to achieve 2,500-3,500 [barrels] by Q1-2011."  Compl., ¶ 28.  The y knew that: (i) Quest had no realistic "expansion plans," (ii) no purported "upgrades" were in the works, and (iii) projections of 2,500 to 3,500 barrels daily was either severely reckless or intentionally deceptive.  *Id.*

**5.      The Downeys promised an illusory interest rate to investors.**

The PPM claimed that PAOR would acquire from Quest a 15% working interest in oil-and-gas leases located on four Texas properties Quest purported to own and operate.  Compl., ¶¶ 18, 29. However, the Downeys knew that the 15% interest that PAOR investors purportedly possessed in the oil-and-gas revenues produced by the KPC Lease was illusory.  Compl., ¶ 29.  Unbeknownst to PAOR investors – because the Downeys did not disclose it to them – the Downeys paid the limited revenues they received from the producing wells on the KPC Lease to the original leaseowner to fulfill payment of the lease's $700,000 purchase price.  *Id.*, ¶ 29.  As late as November 2010 – in the midst of the PAOR offering – Quest still owed $240,000 to the original leaseowner of the KPC Lease.  *Id.*, ¶ 29.  And, the Downeys further agreed to provide the original leaseowner with ***all*** KPC Lease production revenues until the remaining $240,000 indebtedness was paid – a fact the

Downeys did not disclose to PAOR investors in the PPM.  Compl., ¶ 30.  As a result, PAOR investors would not obtain their promised 15% interest until *after* the Lease's purchase price had been fully paid or, given Quest's dire financial straits, PAOR investors may never have received the revenues from the KPC Lease to which they were entitled.  *Id*.  Finally, and contrary to the PPM disclosures, the KPC Lease was operated by its original leaseowner, not by Quest.  *Id*.

**6.     The Downeys failed to disclose that they previously pledged leases as collateral.**

The Downeys failed to disclose that, on behalf of Quest, they had previously pledged two leases as collateral on prior Quest loans.  Compl., ¶ 31.  In fact, the Downeys had previously pledged the MCU Lease *at least twice* by the time the PAOR offering commenced, to secure: (i) Quest's January 2007 acquisition of the MCU Lease and an $832,000 promissory note payable to the original leaseowner of the MCU Lease; and (ii) a 2008 loan (and a 2010 loan) from Bank A.  *Id*.

Similarly, at the time of the PAOR offering, the Downeys and Quest had previously pledged the KPC Lease as collateral in connection with their offer and sale of Quest-issued SPNs between November 2008 and March 2010.  Compl., ¶ 32. And, investors in Quest-issued SPNs were "senior to any debt related to the Company's assets on [the KPC Lease]."[3] *Id*.  The Downeys failed to disclose to PAOR investors these key facts about the SPN offering's effect on the KPC Lease.  *Id*.

And, the Downeys were well-aware of these issues and their potential impact on PAOR investors, because Quest engaged a due diligence provider in August 2009 to analyze the PAOR offering and issue a report to be used to solicit prospective PAOR investors.  Compl, ¶ 33.  In September 2010 – nine months after the PAOR offering commenced – the due diligence provider issued its report and emphasized that the MCU Lease was encumbered by **four** liens, including

---

[3]     The KPC Lease described in the SPN offering documents was the same lease referenced by the Downeys in the PAOR PPM.  Compl., ¶ 32.

those owned by Bank A and the original leaseowner of the MCU Lease.[4]  *Id.*  Despite their

knowledge, the Downeys did not revise or update the PPM to disclose this material risk to PAOR

investors.  *Id.*  Even worse, prospective PAOR investors received an edited version of the due

diligence report that omitted critical warnings about material risks in the PAOR offering.  *Id.*

 The Downeys also knew, from the outset and throughout the PAOR offering, that Quest

was obligated to make interest payments to SPN investors, because the Downeys personally

guaranteed the loans that Quest obtained from banks.[5]  Compl., ¶ 34.  Summarizing these notable

encumbrances and erasing any doubt about the Downeys' knowledge, Paul Downey submitted an

affidavit to a federal court in April 2013, admitting that "virtually all of Quest's assets have been

pledged or encumbered in the course of Quest's efforts to raise capital."  *Id.*

### 7. The Downeys misused offering proceeds.

 In the PPM, the Downeys told PAOR investors that their funds would be used as follows:

- 85.5% (roughly $4.1 million of the $4.8 million raised) to drill and complete nine wells on the MCU and Kilgore Leases;

- 10.5% to pay sales commissions and offering costs; and

- 3.77% for working capital.

Compl., ¶ 35.  However, the Downeys and Quest actually used less than 25% of the $4.8 million

offering proceeds ((approximately $1.1 million) for drilling and completion purposes.  Compl., ¶

36; **Exhibit 2**, Hahn Dec., ¶ 6.  Instead, the Downeys spent $3 million on personal residential and

automobile expenses, payroll, lease royalty obligations, lease purchase debt, bank debt, interest and

principal owed to the SPN note-holders, legal and accounting fees, federal taxes, and insurance.  *Id.*

---

[4] The due diligence provider warned: "Since there is an assignment of revenues that is attached to these two encumbrances, cash flows that would otherwise go to the investors could be diverted to the lender."  Compl., ¶ 33.

[5] The Downey signed loan agreements that listed the MCU lease as collateral.  Compl., ¶ 34.

In the midst of a cash deficit at Quest in the Spring of 2011, the Downeys misused PAOR investor funds by diverting (i) $244,887 to investors in previous Quest offerings, (ii) $150,000 to pay down the acquisition costs of the MCU Lease, and (iii) $466,282 to pay down its debt obligations to Bank A. Compl., ¶ 37; **Exhibit 2**, ¶ 8.  During this time, the Downeys also allocated more than $100,000 of PAOR investor funds to a Naples, Florida tax accounting and estate planning firm that performed research and due diligence services on Quest and the PAOR investment.[6]  Compl., ¶ 38.

The Downeys' conduct, including emails they sent and received, reveals their knowledge of the misuses of PAOR investor funds and the continuing liquidity issues posed by Bank A's automatic monthly withdrawals for Quest's monthly loan installment payments.  Compl., ¶ 39.

### 8.    The Downeys misrepresented information about the Hatchett Ranch Lease.

During the first part of 2011, the Downeys spent $467,331 of PAOR investor funds to purchase the Hatchett Ranch Lease in the name of Quest – not PAOR.  Compl., ¶ 40; **Exhibit 2**, ¶ 8.  After this blatant misuse of PAOR investor funds, the Downeys then advised investors that:

- Quest "ha[d] come to an agreement on acquiring the Hatchett Ranch Lease – a 4,000 acre lease in Callahan County with multiple pay zones.  PAOR will participate in this acquisition *without requiring additional capital*."  (emphasis added).

- The Hatchett Ranch Lease would "be added to the PAOR project **at no additional cost to the original investors**, and should increase the overall performance of the FUND."  (emphasis in original).

Compl., ¶ 40.  As the Downeys were well-aware, the Hatchett Ranch Lease was acquired with PAOR investor funds.  *Id.*  So, *after* the Downeys used PAOR funds to buy an asset for Quest, they then purposely misled investors to believe that the Hatchett Ranch Lease was a PAOR asset when it was not.  *Id.*  Further evidencing their intentional deception, the Downeys attempted to assign the

---

[6]      From the outset, the purpose of these due diligence services was not intended to benefit PAOR investors

Hatchett Ranch Lease in 2013 to repay a $500,000 loan made to Quest – without apprising PAOR investors or seeking their approval.  Compl., ¶ 41.

### 9.     The Downeys misrepresented an annual, independent audit of PAOR.

According to the PPM, Quest's CFO managed PAOR's finances, including "supervising the annual independent audit of [PAOR]."  Compl., ¶ 42.  But the Downeys never authorized or facilitated an independent audit of POAR, and Quest's CFO never supervised such an audit.  *Id.*

### 10.     The Downeys misled investors about potential litigation.

The PAOR PPM stated that, " to the best knowledge of the Company, no legal actions are contemplated against the Company and/or its Directors, Officers and Shareholders."  Compl., ¶43.  However, at least 11 months *before* the PAOR offering commenced, the Downeys were contacted by a receiver appointed by a federal district court in Tampa, Florida and served with a subpoena for documents related to $5.1 million flowing to Quest from investors in a 10-year-old Ponzi scheme.[7]  *Id.*  The receiver apprised the Downeys that it intended to take possession of *all* Quest outstanding common stock, pursuant to the Downeys' 2007 pledge of the stock as collateral for the $5.1 million infusion to Quest.  *Id.*  Thus, the Downeys faced the *likelihood* the receiver would seek to liquidate some or all of Quest's assets, take possession of its common stock, or replace its management.  *Id.*  Despite this reality, the PPM does not mention the receiver, the source of the $5.1 million infusion, or the potential adverse consequences to Quest and PAOR as a result of this asserted claim.  *Id.*

(..continued)

and, instead, diverted investor funds.  Compl., ¶ 38.

[7]     Throughout 2009, the receiver reiterated to the Downeys that the source of the $5.1 million invested with Quest was a group of defrauded investors, and that it was his responsibility to recoup the funds for their benefit.  Compl., ¶ 43.

# II.
# ARGUMENT

## A.     The Default Judgment Standard

Entry of a default judgment is left to the Court's "sound judicial discretion," which is given

deference upon review.  *See James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *Mason v. Lister*, 562

F.2d 343, 345 (5th Cir. 1977).

Under Fifth Circuit law, there are three steps in obtaining a default judgment: (1) default;

(2) entry of default; and (3) default judgment.  *See New York Life Ins. Co. v. Brown*, 84 F.3d 137,

141 (5th Cir. 1996) (citing FED. R. CIV. P. 55(a)).  In determining whether to enter a default

judgment, the Court should accept as true all of the factual allegations in the Complaint, except

those relating to damages.  *See U.S. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987);

*Nishimatsu*, 515 F.2d at 1206.  An appropriate damages award remains to be established by proof

unless the amount is liquidated or susceptible of mathematical computation.  *See United Artists*

*Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979).  "Where the amount of damages and/or costs

can be determined with certainty by reference to the pleadings and supporting documents and where

a hearing would not be beneficial, a hearing is unnecessary."  *James*, 6 F.3d at 310; *see also United*

*Artists Corp.*, 605 F.2d at 857 (holding that a damages hearing is not required if there is "a

demonstration by detailed affidavits establishing the necessary facts").  The Commission is

"entitled to all reasonable inferences from the evidence offered."  *Shipco Gen.*, 814 F.2d at 1014.

## B.     The Complaint Establishes Paul Downey's Securities Law Violations

Well-pleaded allegations in a complaint are deemed admitted on a motion for default

judgment.  *See Nishimatsu*, 515 F.2d at 1206 (5th Cir. 1975).  Allegations in the Complaint

establish that Paul Downey engaged in fraud in connection with the offer, purchase, and sale of securities in violation of the antifraud provisions of the Securities Act and the Exchange Act.

> 1. **Paul Downey violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.**

Section 17(a) of the Securities Act prohibits the employment of a fraudulent scheme or the making of material misrepresentations or omissions in the offer or sale of a security.  15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act prohibits using a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security.  15 U.S.C. § 78j(b).  Rule 10b-5 thereunder makes it unlawful, in connection with the purchase or sale of securities: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  17 C.F.R. § 240.10b-5.  A violation of these provisions occurs only if the misrepresented or omitted facts are material.  Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in his investment decision, and would view it as having significantly altered the total mix of available information.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter, while Sections 17(a)(2) and (3) require a showing of negligence.  *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).  Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Fifth Circuit, scienter may be established by a showing that the defendant acted

intentionally or with severe recklessness. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'"); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).  Proof of recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n. 30 (1983).

Downey violated these antifraud provisions by making false and misleading statements and failing to disclose material facts in the PPM (which he and his son drafted), and in conducting a scheme to defraud the PAOR investors.  The numerous misstatements and omissions include:

- repeated representations of Quest's success as an oil and gas company, including inflated production numbers, and failure to disclose Quest's perilous and deteriorating financial condition.  *See SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (finding information about issuer relating to its financial condition, solvency, and profitability material to purchasers of LP interests);

- statements that Quest owned and operated oil-and-gas leases, and failure to disclose that half of the leases had been pledged as debt collateral to various sources;

- failing to inform investors that their interest in the KPC lease was a sham, since revenues were going to KPC's original leaseowner – who also happened to be the lease's operator, contrary to the Downey's representations;

- statements that 85% of investor funds would be used for drilling and completing wells on two of the leases, and failure to inform investors that, at most, only 24% of the proceeds were so used, and that at least 62% was misallocated;

- statements implying that PAOR would be independently audited; and

- the false representation that there was no anticipated legal actions against Quest, despite the Downeys' knowledge of the receiver's intention to recover from Quest $5.1 million in investor funds belonging to victims of the Nadel Ponzi scheme.

All of these misrepresentations and omissions concerned facts that were integral to assessing the nature and risk of the LP units, and therefore were material.  Information regarding

Quest's *actual* financial condition, the multiple liens on the LP's leases, the diversion of KPC oil revenue, the misuse of investor funds, the illusory annual independent audit, and the knowingly false optimism about the lack of future lawsuits, are facts that – had they been clearly and accurately disclosed – would have deterred, or at least given the investors pause, about investing in the PAOR offering.  As described above, Paul Downey acted with a high degree of scienter, making knowing misrepresentations and omissions to investors and using investor funds for purposes other than were represented in the PPM that he helped to draft.   For all these reasons, Downey violated the antifraud provisions of the Securities Act and the Exchange Act.

**C.      The Commission is entitled to the relief requested in the Complaint.**

The Commission is entitled to the relief pleaded for in its Complaint, addressed below.

**1.      Entry of a Permanent Injunction is Appropriate**

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act provide that, upon a proper showing that the defendant is engaged or is about to engage in any acts or practices constituting a violation of the Securities Act and the Exchange Act, the district court shall impose a permanent injunction against the Defendant.  15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); *see SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980). The Commission makes a proper showing by proving it is reasonably likely that the defendant will violate the securities laws again.  *Zale Corp.*, 650 F.2d at 720 ("[SEC] is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a 'reasonable likelihood' of future transgressions."); *Mize*, 615 F.2d at 1051; *see also SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978), *cert. denied sub nom.*, *Helfat v. SEC*, 439 U.S. 953 (1978); *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1973).  And, the Court should evaluate the totality of the circumstances. *Zale Corp.*, 650 F.2d at 720.

In imposing a permanent injunction, courts consider a number of factors, including the (i) egregiousness of the defendant's conduct, (ii) isolated or recurrent nature of the violation, (iii) degree of scienter, (iv) sincerity of defendant's recognition of his transgression, and (v) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.2d 932, 940 (5th Cir. 2009). The mere cessation of the illegal conduct does not foreclose injunctive relief. *Murphy*, 626 F.2d at 655. In *SEC v. Gann*, the Fifth Circuit held that a defendant's past illegal conduct raised a presumption the defendant would commit future violations – justifying an injunction – even though the defendant's job no longer involved selling securities.

All of these factors support entry of a permanent injunction against Paul Downey, whose violations were multiple, continued, and egregious. He acted with high degree of scienter and misappropriated investor funds for his personal use. The misrepresentations, omissions, and schemes were conducted intentionally. Given the egregiousness of Downey's conduct, the evidence, for all the reasons set out above, supports an injunction both against violation of the securities laws in general and a specific injunction prohibiting Downey from participating, directly or indirectly, in any securities offering, including acting as a manager, administrator, promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance of any securities.

### 2.   Disgorgement and Prejudgment Interest are Warranted.

Defendants orchestrated a fraudulent scheme that raised $4.8 million. Based on allegations that are deemed true, the Court should: (i) find that Paul Downey violated the federal securities

laws, (ii) order disgorgement of all ill-gotten gains by the Defendants, jointly and severally, and (iii)

determine the amount of disgorgement.[8]

  "The District Court has broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged." *SEC v. Huffman*, 996 F.2d 800,

802 (5th Cir. 1993); *see also SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993); *SEC v.

AmeriFirst Funding, Inc.*, 2008 U.S. Dist. LEXIS 36782 (N.D. Tex. 2008); *SEC v. Reynolds*, 2008

U.S. Dist. LEXIS 65669 (N.D. Tex. 2008).  The law does not require precision in determining the

proper amount of disgorgement, rather "disgorgement need only be a reasonable approximation of

profits causally connected to the violation." *Id.*; *see also Allstate Ins. Co. v. Receivable Fin. Co.

LLC*, 501 F.3d 398, 413 (5th Cir. 2007).  As one court explained:

> If exact information were obtainable at negligible cost, we would not
> hesitate to impose upon the government a strict burden to produce
> that data to measure the precise amount of the ill-gotten gains.
> Unfortunately, we encounter imprecision and imperfect information.
> . . . Rules for calculating disgorgement must recognize that
> separating legal from illegal profits exactly may at times be a near-
> impossible task.

*SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).

  Once the Commission presents evidence reasonably approximating the amount of ill-gotten

gains, the burden of proof shifts to the defendant.  *See SEC v. ConnectAJet.com, Inc.*, 2011 U.S.

Dist. LEXIS 130215, 2011 WL 5509896, at *7 (N.D. Tex. Nov. 9, 2011); *AmeriFirst Funding, Inc.*,

2008 U.S. Dist. LEXIS at *4; *First City*, 890 F.2d at 1232.  The defendant is then "obliged clearly

---

[8]  Disgorgement is "meant to prevent the wrongdoer from enriching himself by his wrongs." *Huffman*, 996
F.2d at 802-03 (5th Cir. 1993); *see also SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993); *Blatt*, 583 F.3d at
1335.  By preventing unjust enrichment, disgorgement also has the effect of "deterring violations of law." *CFTC v.
British American Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir.), *cert. denied*, 479 U.S. 853 (1986).  "The
deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not
required to disgorge illicit profits." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

to demonstrate that the disgorgement figure [is] not a reasonable approximation."[9]  *First City*, 890

F.2d at 1232; *Reynolds*, 2008 U.S. Dist. LEXIS at *7.

Here, the Downeys and Quest fraudulently raised $4.8 million from PAOR investors.

**Exhibit 2**, ¶ 5.  This sum is a reasonable approximation of disgorgement to be assessed against

Defendants, as it represents the gross amount of their ill-gotten profits.  No affirmative evidence in

the record disputes the reasonableness of this amount, and any risk of uncertainty falls on

Defendants.  *SEC v. Harris*, 2012 U.S. Dist. LEXIS 31394 (N.D. Tex. Mar. 7, 2012) (citing *SEC v.

Patel*, 61 F.3d 137, 140 (2d Cir. 1995)).  Even if Defendants retained only a portion of their total ill-

gotten gains, $4.8 million in investor funds raised is a reasonable approximation for

disgorgement.[10]  *SEC v. Halek*, 537 F. App'x. 576, 581-82 (5th Cir. 2013) (finding it irrelevant to a

disgorgement calculation how ill-gotten gains were distributed and spent and requiring defendants

to disgorge all $21 million raised – even though defendants received less than $500,000

personally).[11]

It is well-settled that Courts may add prejudgment interest to a defendant's disgorgement

amount to prevent him from benefitting from the use of ill-gotten gains interest-free.  *Blatt*, 583

F.2d at 1325.  Whether to award prejudgment interest is within the district court's discretion.  *SEC*

---

[9]      In determining an approximate amount of ill-gotten profits, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."  *Hughes*, 917 F. Supp. at 1085; *SEC v. Strauss*, 2011 U.S. Dist. LEXIS 38248 (N.D. Miss. 2011).  "[D]oubts are to be resolved against the defrauding party."  *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983); *see also Hughes*, 917 F. Supp. at 1085.

[10]     Alternatively, if the Court prefers to give Defendants credit for the amount *actually* allocated for drilling and completing costs ($1.1 million) [**Exhibit 2**, ¶ 6], Paul Downey's disgorgement would be $3.7 million.

[11]     In *Halek*, the defendants did not contest that their scheme raised $21 million, as alleged by the Commission.  Instead, Halek complained that he only directed a small amount to his personal accounts and distributed the remainder.  But, the Fifth Circuit held, defendants had the full benefit of all ill-gotten gains and how it was ultimately distributed and spent was irrelevant to their liabililty for disgorgement.  *See also SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained"); *SEC v. JT Wallenbrook & Assoc.*, 440 F.3d 1109, 1116 (9th Cir. 2006); *SEC v. United Energy Partners, Inc.*, 88 F. App'x. 744 (5th Cir. 2004); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000).

*v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir.) (per curiam), *cert. denied sub nom.*, *Quinn v. SEC*, 543 U.S. 1034 (2004); *SEC v. Gunn*, 2010 U.S. Dist. LEXIS 88164 (N.D. Tex. 2010).  When, as here, a wrongdoer enjoyed access to funds over a prolonged period as a result of the wrongdoing, ordering payment of prejudgment interest is consistent with the equitable purpose of the disgorgement remedy.  *See Hughes*, 917 F. Supp. at 1090 (ordering prejudgment interest comports with fundamental notions of fairness, because defendants had benefit of nearly $2 million for nine years).  Paul Downey should be ordered to pay prejudgment interest because he enjoyed the benefit of investor funds he fraudulently obtained, offending basic principles of justice and equity.

The IRS underpayment of federal income tax rate [26 U.S.C. § 6621(a)(2)] is appropriate for calculating prejudgment interest in enforcement actions.  That rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).  Based on a principal disgorgement amount of $4.8 million, application of the tax underpayment rate from January 2010 (the date the PAOR offering began) results in a total prejudgment interest amount of $879,935.[12]  **Exhibit 2**, ¶ 10.

**3.      The Court Should Order Defendant Paul Downey to Pay a Third-Tier Civil Penalty and Should Set the Penalty Amount.**

Given the nature and scope of this fraud, the Commission requests the Court to order Paul Downey to pay a third-tier civil penalty, and to set the penalty amount.  Paul Downey's securities law violations involved fraud and deceit, and directly caused loss of investor funds.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Commission to seek, and the Court to impose, a third-tier penalty if the defendant's violation

"involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

requirement," and the violation "directly or indirectly resulted in substantial losses or created a

significant risk of substantial losses to other persons."  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3);

17 C.F.R. 201.1004 (increasing statutory amounts to reflect inflation).  For individuals, these

provisions set forth a maximum penalty for each third-tier violation as the greater of $160,000 or

the gross amount of the defendant's pecuniary gain.  Under the third tier, Paul Downey's civil

penalty can range from $0 up to the low maximum of $160,000 per violation, or the high maximum

of $4.8 million, the gross amount of his pecuniary gain.  Each misrepresentation or omission of a

material fact is an independent violation, so the Court should assess a civil penalty against Paul

Downey of either: (i) $4.8 million, representing his gross pecuniary gain, or (ii) $160,000 per each

misrepresentation or omission of a material fact made by the Defendants.  Although the statutory

tier determines the maximum penalty allowed per violation, the actual amount of the penalty to be

imposed is left to the Court's discretion.  *See SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *SEC

v. Universal Express, Inc.*, 646 F. Supp. 552, 567 (S.D.N.Y. 2009).  The following factors are

relevant in determining whether a civil penalty is appropriate and, if so, in what amount: (i)

egregiousness of the defendant's conduct; (ii) the degree of defendant's scienter; (iii) whether the

defendant's conduct created substantial losses or the risk of substantial losses to other persons; (iv)

whether the defendant's conduct was isolated or recurrent; (v) whether the defendant has admitted

wrongdoing; and (vi) whether the penalty should be reduced due to the defendant's demonstrated

current and future financial condition.  *See Razmilovic*, 2011 U.S. Dist. LEXIS 113447 (E.D.N.Y.

2011); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009).  Four of these

`(..continued)`
[12]  Alternatively, if the Court gives Defendants a credit for the $1.1 million *actually* allocated for drilling and
completion costs and uses a disgorgement figure of $3.7 million, application of the tax underpayment rate from
January 2010 results in a total prejudgment interest amount of $678, 283. **Exhibit 2**, ¶ 10.

factors were addressed in evaluating the appropriateness of permanent injunctive relief (*supra* at

Section II.C.1).  Additionally, the conduct at issue here resulted in $4.8 million in losses to

investors in PAOR, and there is no evidence in the record about Paul Downey's demonstrated

current and future financial condition.[13]  Thus, the Commission moves the Court to order Paul

Downey to pay $4.8 million in civil monetary penalties in this case.

### 4.   The Court Should Bar Downey From Serving as an Officer or Director.

Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, as amended

by the Sarbanes-Oxley Act, authorize federal courts to bar an individual who violates the antifraud

provisions of the federal securities laws if the person's conduct demonstrates "unfitness" to serve as

an officer or director of a public company.  15 U.S.C. § 77t(d)(4); 15 U.S.C. § 78u(d)(2).  The

Court's equitable power to fashion appropriate relief also includes the power to order an officer and

director bar.  *SEC v. Schiffer*, 1998 WL 266101, at *3 (S.D.N.Y. 1998) ((officer-and-director bar is

equitable remedy protecting against future public harm) (citing *SEC v. Posner*, 16 F.3d 520, 522

(2d Cir. 1994)).  In determining "unfitness," courts consider six factors: (i) the egregiousness of the

underlying securities law violations; (ii) the defendant's prior offenses; (iii) the defendant's role or

position when he engaged in the violations; (iv) the degree of scienter; (v) defendant's economic

stake or benefit in the violation; and (vi) the likelihood that the misconduct will recur.  *See, e.g.,*

*SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995); *SEC v. Bankosky*, 716 F.3d 45, 48-49 (2d Cir. 2013)

(affirming continued applicability of Patel factors to O&D bar analysis post-Sarbanes Oxley).

Courts may consider some of these factors, all of them, or additional factors.  *See Patel*, 61 F.3d at

141; *SEC v. Selden*, 632 F. Supp. 2d 91, 96-97 (D. Mass. 2009).

---

[13]     As discussed above, Paul Downey invoked his Fifth Amendment right not to incriminate himself in the
underlying SEC investigation that preceded the filing of this litigation and did not testify.  **Exhibit 1**, ¶ 4.
Accordingly, there is no evidence in the record about Paul Downey's financial condition.

Here, Paul Downey served as Quest's CEO throughout this fraud, which included at least half a dozen *categories* of misrepresentations and omissions, evidencing: (i) Downey's central role in the fraud, (ii) the egregiousness of the violations, and (iii) the level of scienter involved. Paul Downey also benefitted greatly from the fraud. **Exhibit 2**, ¶¶ 6-9.

## III.
## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant this motion and enter a Final Judgment against Defendant Paul Downey:

(a)     permanently enjoining him from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

(b)     permanently enjoining him from, directly or indirectly, soliciting existing or potential investors to purchase or sell securities, provided however that such injunction shall not prevent him from purchasing or selling securities for their own accounts;

(c)     permanently enjoining him from participating, directly or indirectly, in any securities offering, including acting as a manager, administrator, promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance of any securities;

(d)     ordering him to disgorge $4.8 million in ill-gotten funds and benefits obtained or to which he was not otherwise entitled, as a result of the violations herein;

(e)     ordering him to pay $879,935 in prejudgment interest;

(f)     ordering him to pay civil penalties under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act in an amount to be determined by the Court;

(g)     prohibiting him from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that is required to file reports under Section 15(d) of the Exchange Act;

(h)     granting such additional relief as the Court deems just, appropriate, and equitable.

Respectfully submitted,


Dated:  April 13, 2015                    */s/ B. David Fraser*
                                          B. DAVID FRASER
                                          Lead Attorney
                                          Texas Bar No. 24012654
                                          SECURITIES AND EXCHANGE COMMISSION
                                          Burnett Plaza, Suite 1900
                                          801 Cherry St., Unit #18
                                          Fort Worth, TX 76102-6882
                                          (817) 978-1409
                                          (817) 978-4927 (fax)
                                          FraserB@sec.gov

                                          ATTORNEY FOR PLAINTIFF
                                          SECURITIES AND EXCHANGE COMMISSION

## CERTIFICATE OF SERVICE

On April 13, 2015, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

**Email and UPS:**

Jeffry Downey
3525 Cerromar Street
Abilene, TX  79606
jpdowney@gmail.com
*Defendant Pro Se*

Paul R. Downey
5718 Lago Villaggio Way
Naples, FL  34104
pauldowney43@gmail.com
*Defendant Pro Se*

**Email and Mail:**
John M. Leonard
8805 Tamiami Trail Lane
UPS Mailbox # 109
Naples, FL  34108
jleonard1029@gmail.com;
jleonard@eckardglobal.com;
golfexec1@gmail.com
*Defendant Pro Se*

*/s/ B. David Fraser*
B. DAVID FRASER